UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

Matt Dash, Individually And On Behalf of
All Others Similarly Situated,

**CV 13**   Case No.   **6329**

                                          Plaintiff,

            -against-

SEAGATE TECHNOLOGY (US) HOLDINGS, INC.,

                                          Defendant.

CLASS ACTION
COMPLAINT
Jury Trial Demanded

WEXLER, J.

------------------------------------------------------------------X

Plaintiff Matt Dash, for his class action complaint on behalf of himself and all others similarly situated, upon personal knowledge as to the facts pertaining to him and upon information and belief as to all other matters, based on investigation of his counsel, against defendant Seagate Technology (US) Holdings, Inc. ("Seagate").

**NATURE OF ACTION**

1.      This is a consumer class action for damages and injunctive relief arising from Defendant's deceptive and unlawful conduct in marketing and selling of external hard drives with the Thunderbolt I/O interface (the "Thunderbolt drives" or "Products").

2.      Defendant states on the packaging of its Thunderbolt drives, on it company web page, and elsewhere, of the "shocking speed" performance of its Thunderbolt drives.

3.      Defendant's Thunderbolt drives, however, do not (and at the present time cannot) reach these touted speeds.

4.      Defendant's Thunderbolt drives sell at a premium price to consumers based on the claimed improved interface speed over other "slower" interfaces such as Universal Serial Bus Hi-Speed ("USB 2").

5. That claimed interface speed, advertised and touted by Defendant for their Thunderbolt drives, as sold, is impossible to attain. It is indeed impossible for ANY existing hard drive to take full advantage of the claimed Thunderbolt speed.

6. Defendant continues to market and sell their Thunderbolt drives fraudulently and at a premium to other hard drives capable of the same actual transfer speeds.

## PLAINTIFF

7. Plaintiff Matt Dash lives in Port Washington, NY and is a citizen of the United States.

8. Plaintiff purchased a LaCie "Rugged Thunderbolt Series" 1TB Orange External Hard Drive [Model number 9000294] 5400 RPM with a Thunderbolt Interface on August 2, 2013.

9. Plaintiff paid approximately $200 for the drive.

10. Plaintiff is an amateur photographer with high-end equipment and takes very high definition photos, resulting in very large size computer files.

11. Plaintiff intended to use the drive to store large files for use on his laptop: movie files transferred from his HD video camera, music files and movies purchased from the Internet. Files of this nature can be several gigabytes in size.

12. Speed in transfer of data was the crucial feature to plaintiff's purchasing decision.

13. Plaintiff believed the drive he was buying was the fastest possible external hard drive because of the Thunderbolt interface.

14. Because in fact the drive did not transfer data at the rate claimed by Defendant, Plaintiff overpaid for the drive and was damaged thereby.

**DEFENDANT**

15.     Defendant Seagate Technology (US) Holdings, Inc. ("Seagate" or "the Company") manufactures and markets disc drives for enterprise, desktop, mobile computing, consumer electronics, and branded solutions markets of the disc drive industry.

16.     The company was incorporated in in Delaware in 2000 and is based at 920 Disc Drive, Scotts Valley, California.

17.     Seagate is a wholly owned subsidiary of Seagate Technology Public Limited Company ("Seagate PLC"), which is incorporated in Ireland.

18.     Seagate PLC's Irish headquarters are at 38/39 Fitzwilliam Square, Dublin 2, Ireland.

19.     According to the Defendant's 2012 10-K, Seagate PLC acquired 64.5% of LaCie S.A. on August 3, 2012. Seagate PLC paid approximately $117 million in cash for the acquisition.

20.     LaCie S.A. is a maker of hard drives as well as other storage peripherals for computers.

21.     According to Seagate PLC's Form 10-K, as filed with the SEC for the fiscal year ended June 28, 2013 ("the 10-K"), Exhibit 21.1 titled "Seagate Technology Public Limited Company Subsidiaries as of June 28, 2013" lists LaCie S.A. as a wholly owned subsidiary of Seagate.

**VENUE AND JURISDICTION**

22.     Venue in this Court is proper because Defendant's parent company is listed on the New York Stock Exchange and because a substantial part of the acts or omissions giving rise to the claims in this action occurred in this Judicial District.

23.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because (a) the class has more than 100 members,

(b) at least one of the members of the proposed class is a citizen of a state other than New York, and (c) the total amount in controversy exceeds $5 million exclusive of interest and costs.

24.     This Court has personal jurisdiction over Defendant because a substantial portion of the wrongdoing alleged in this Complaint took place in this District; Defendant is authorized to do business in this District, has sufficient minimum contacts with this District; and/or otherwise intentionally avails itself of the markets in this District through the promotion, marketing and sales of its Products in this District so that the exercise of personal jurisdiction of this Court complies with judicial notions of fair play and substantial justice.

## BACKGROUND FACTS

25.     A computer is a device that uses a central processing unit ("CPU") and random-access memory ("RAM") to perform tasks.  The CPU and RAM act together as the brain of the computer.

26.     When electricity is cut from the computer, any information in the CPU or RAM is lost.

27.     Disk drives are used to store information for a longer term, and information currently written to a disk drive is retained if electricity is cut from the computer.

28.     The storing and retrieving of information to or from a disk drive for a computer is called an input or output operation ("I/O").

29.     A physical disk hard drive (a "hard drive") is an electromechanical data storage device used for storing and retrieving information for a computer using rotating discs (called platters) coated with magnetic material with motors to spin or "drive" the discs.

30.     The drive uses a physical moving actuator arm to read and write data to the surfaces by magnetically changing areas on the platters from instructions received from the computer.

4

31.     The speed at which a hard drive can perform I/O operations depends on several factors, including the revolutions-per-minute ("rpm") of platter spin.

32.     A 5400-rpm hard drive, for example, has lower I/O than a 7200-rpm or a 10,000-rpm drive.

33.     Faster I/O means it requires less time to move a certain amount of data.

34.     A solid-state drive (or "SSD") contains neither platters nor motors to "drive" the discs.  It is a newer, faster data storage device used for storing and retrieving information for a computer.

35.     SSDs are typically more expensive than electromechanical drives because they are able to transfer and store data faster (they are capable of faster I/O).

36.     Drives are also measured by their capacity by using a multiple of the unit "byte" for digital information or computer storage.

37.     The prefix giga (symbol "G") is defined in the International System of Units as a multiplier of $10^9$ and therefore 1 gigabyte ("GB") = $10^9$ bytes = 1,000,000,000 bytes.

38.     A personal computer user today needs larger and larger data storage than a user from even 2 years ago.

39.     An Apple laptop, for example, will ship with anywhere from a 128 GB SSD to a 750GB hard drive.

40.     I/O from drives can be measured several standardized ways: the Maximum. Sustained Data Transfer Rate (MB/s) and the Maximum. Data Transfer Rate (MB/s) for example.

41.     Standards for internal drive connectors also affect I/O. SATA and IDE are two standards for internal drive connection.

42.     In order to add more drive storage to a laptop computer or to a desktop or server computer without opening the case, computer manufacturers developed external interfaces.

43.     These external interfaces allow for external devices to interface with the computer, while allowing easy attachment and detachment of the device.

44.     There are interfaces for displays [VGA, DVI, and HDMI ports, for example], networking [modems and Ethernet ports], sound [miniport, digital coaxial audio, or Toslink optical ports, for example], and storage peripherals such as memory sticks, optical drives, and external hard drives.

45.     Storage devices use specialized I/O ports on a computer that both power the device and move data to and from the computer.

46.     Standard ports used today for storage devices are Universal Serial Bus, IEEE 1394 ("FireWire"), and the newest addition, Thunderbolt.

47.     The Universal Serial Bus ("USB") standard came into use in the 1990's and has three iterations: USB 1 [also called USB Full Speed], USB 2.0 [also called USB High Speed] and USB 3.0 [also called USB Super Speed].

48.     The differences in the USB standard are the shape of the plugs, the speed of data transfer possible, and the amount of power deliverable.

49.     Data transfer speed is measured in units per second, usually megabits per second ("Mb/s") or megabytes per second ("MB/s"). In data transfer, higher numbers are faster and mean it will take less time to transfer for the computer to or from the storage peripheral.

50.     For example; if a user moved 20 digital photos that were 1 megabyte in size from a computer hard drive to an external storage device, the operation would take 10 seconds at 2 MB/s, 4

6

seconds at 5 MB/s and 1 second at 20 MB/s [according to the online calculator at http://www.calctool.org/CALC/prof/computing/transfer_time]

51.     USB 1 was released in January of 1996 and had a top speed of 12 Mb/s. USB 2.0 was released in April 2000 and had a specification effective throughput of up to 480 Mb/s. USB 3.0 was released in November 2008 and the standard specifies a usable data rate of up to 4 to 5 Gbit/s.

52.     FireWire comes in two iterations: 400 and 800. As with USB, the differences in the FireWire standard are the shape of the plugs, the speed of data transfer possible, and the amount of power deliverable to devices.

53.     Apple introduced FireWire 400 in 1986. It has a top transfer speed of 400 Mbit/s. FireWire 800 was introduced by Apple in 2003. It has a top transfer speed of 800 Mbit/s.

54.     Thunderbolt is the new computer interface that is touted as the fast I/O solution of the Apple line.  Apple first included a Thunderbolt interface on its laptops in 2011.

55.     Various PC makers are also beginning to include Thunderbolt ports in their newest high-end PCs.

56.     The standard for Thunderbolt specifies top data transfers up to 10 Gbit/s per channel. An Internet computer hardware review website posted a graphic that compares the interface speeds.



http://www.tomshardware.com/reviews/thunderbolt-performance-z77a-gd80.3205.html

57.    In summary, under the manufacturer's specifications, the interfaces have the following throughputs [also called bandwidths]:

a.    USB 2.0 can transfer data at a top speed of up to 480 Mbits/s

b.    Firewire 800 can transfer data at a top speed of up to 800 Mbits/s;

c.    USB 3.0 can transfer data at a top speed of up to 5,000 Mbits/s; and

d.    Thunderbolt can transfer data at a top speed of up to 10,000 Mbit/s;

58.    Many factors come into play when measuring real world vs. theoretically attainable speeds. On the website of the USB standards organization, several factors are discussed:

> USB's actual throughput is a function of many variables. Typically, the most important ones are the target device's ability to source or sink data, the bandwidth consumption of other devices on the bus, and the efficiency of the host's USB software stack. In some cases, PCI latencies and processor loading can also be critical.

http://www.usb.org/developers/usbfaq#band1

59.    The device sending the data using the interface is also determinative of the true speed of the transfer of data.

60.     One of the uses for the Thunderbolt interface is high-definition video, which requires very high data transfer speed. Various computer displays have implemented Thunderbolt ports for this purpose.

61.     Data transfer from a hard disk currently has theoretical and practical maximum speeds.

62.     Tom's Hardware webpage comparing speed test results ("benchmarks") of various internal drives has examples of hard drives throughputs. Two of the drives tested, Western Digital's WD4001FAEX and Hitachi's Deskstar 7K4000 were compared to another drive, the Seagate Barracuda. The author avers, "no drive is able to come close to Seagate's Barracuda, and its read and write speed averages that exceed 150 MB/s." All of these drives spin at 7,200 rpm and are electromagnetic drives.

63.     The Google calculator translates MB/s into Mb/s as "150 (MB / s) = 1200 Mb / s" which means that at their fastest, those 3 top drives use less bandwidth that is available with a USB 3.0 interface. [need explanation]

64.     On the web retailer NewEgg.com, a major seller of computer peripherals, there is a distinct and marked price difference between an external hard drive with a USB 3.0 interface and a Thunderbolt interface.

65.     Here is a list of examples of external drives with USB 3.0 interfaces available on NewEgg.com as of June 21, 2013:

a.      A TOSHIBA "Canvio 3.0" 1TB Black Portable Hard Drive [Model number HDTC610XK3B1] 5400 RPM with a USB 3.0 Interface sells for $75;

b.      A Western Digital "My Passport" 1TB Black Portable Hard Drive [Model number WDBBEP0010BBK-NESN] with a USB 3.0 Interface sells for $80;

c.    A Seagate "Expansion" 1TB Black Portable Hard Drive [Model number STBX1000101] with a USB 3.0 Interface sells for $80;

d.    A LaCie "Porsche Design P'9220" 1TB External Hard Drive [Model number 302000] with a USB 3.0 Interface sells for $120;

e.    An ADATA "DashDrive Durable Series HD710" 1TB Blue Water & Shock Proof Portable Hard Drive [Model number AHD710-1TU3-CBL] with a USB 3.0 Interface sells for $100;

f.    A LaCie "Rugged Mini" 1TB Orange External Hard Drive [Model number 301558] 5400 RPM with a USB 3.0 Interface sells for $130;

66.    There are very few external drives with Thunderbolt interfaces available on NewEgg.com as of June 21, 2013, but there is one that compares to the list above: A LaCie "Rugged Thunderbolt Series" 1TB Orange External Hard Drive [Model number 9000294] 5400 RPM with a Thunderbolt Interface sells for $249.99.

67.    LaCie is a division of Seagate and a brand owned, sold, and operated by Defendant.

## ALLEGATIONS

68.    In selling its Thunderbolt products, LaCie uses uniform graphics on all its packaging.

69.    Except for stickers that state the size of the drive, Defendant's Thunderbolt external hard drive is sold in different models with essentially the same graphics and verbiage that explain the features of the product.

70.    The back of the box of any LaCie Thunderbolt drive shows a bar chart comparison of the interfaces:

- Thunderbolt close to 10

- USB 3 at 5

- FW [FireWire] 800 at 1

- USB 2 at 1/2

71.     This graph suggests that the LaCie Thunderbolt drive in the package will transfer data at 10 times the speed of a FireWire 800 external hard drive and at 20 times the speed of a USB 2.0 external hard drive.

72.     Also on the back of the box underneath the bar chart is a graphic of a round, dial speedometer pegged at "10 Gb/s" with the heading "Shocking Speeds Up To 10Gb/s".



73.     The front of the box touts this same speedometer and verbiage.

74.     On the side of the box for the LaCie "Rugged Thunderbolt Series" 1TB Orange External Hard Drive [Model number 9000294] is a column titled "Specifications" stating that the drive inside is a 1 terabyte [TB] drive "ROTATIONAL SPEED / CACHE 5400rpm /8 mb or greater."



75.     These specifications appear to claim that the Thunderbolt interface is at least twice as fast in moving drive data on this drive as a USB 3.0 drive.

76.     These states are false and misleading because no 5,400 rpm drive in existence today exceeds the throughput of a USB 3.0 device.

77.    It is not physically possible on any external drive they sell to attain any speed close to what they claim. There are no drives that can deliver data fast enough to take advantage of the Thunderbolt speed.

78.    On the computer review site Anandtech.com in an article entitled "Hitachi G-Technology Releases G-RAID Thunderbolt Storage Solution" by Kristian Vättö on April 17, 2012, the reviewer stated:

> **For $190 you can get a 3TB USB 3.0 hard drive that will perform the same due to the fact that the hard drive is the bottleneck.**

[Emphasis added] http://www.anandtech.com/show/5759/hitachi-gtechnology-releases-graid-thunderbolt-storage-solution

79.    Also on the computer review site Anandtech.com in an article entitled "Promise Pegasus R6 & Mac Thunderbolt Review" by site founder Anand Lal Shimpi on July 8, 2011, the reviewer stated:

> A single 2TB Hitachi Deskstar 7K3000 is good for sequential transfer rates of up to ~150MB/s. With six in a RAID5 configuration, we should be able to easily hit several Gbps in bandwidth to the Pegasus R6. **The problem is, there's no single drive source that can come close to delivering that sort of bandwidth.**

[Emphasis added]  http://www.anandtech.com/show/4489/promise-pegasus-r6-mac-thunderbolt-review/6

80.    Even with a 7,200 rpm drive [which transfers data faster than a 5,400 rpm drive as found in the LaCie Thunderbolt product] you cannot attain speeds faster than those easily handled by the less expensive USB 3.0.

81.    Even SSDs cannot fully utilize the bandwidth of USB 3.0, making any Thunderbolt solution overkill and a waste of money.

82.    LaCie though its deceptive sales, advertising and packaging knowingly leads consumers to believes its Thunderbolt drives will transfer data faster than is actually possible and

14

faster than cheaper USB 3.0 drives, to lead the unwary consumer purchase their Thunderbolt drive over another brand and to pay more for their Thunderbolt drives without delivering the claimed capabilities.

## CLASS ACTION ALLEGATIONS

83.     Plaintiff brings this action pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of himself and a Class defined as follows:

> All purchasers of Defendant's Products using the Thunderbolt interface.
>
> Excluded from the Class are (i) Defendant, any entity in which Defendant has a controlling interest or which has a controlling interest in Defendant, and Defendant's legal representatives, predecessors, successors, assigns, and employees and (ii) the judge and staff to whom this case is assigned, and any member of the judge's immediate family.

84.     Plaintiff is a member of the Class that he seeks to represent.  Members of the Class can be identified using Defendant's records of online retail sales, Product registrations, and other information kept by Defendant in the usual course of business and/or in the control of Defendant. Class members can be notified of the class action through publication on User websites and direct e-mailings to address lists maintained in the usual course of business by Defendant.

85.     Class members are so numerous that their individual joinder is impracticable. The precise number of the class members is unknown to Plaintiff, but it is clear that the number greatly exceeds the number to make joinder impossible.

86.     Common questions of law and fact predominate over the questions affecting only individual Class Members.  Some of the common legal and factual questions include:

> a.      Whether Defendant's Products were deceptively marketed, distributed, and sold;

b.       Whether Defendant knew or should have known that the Products were deceptively marketed, distributed, and sold;

c.       Whether Defendant misrepresented the transfer speeds and usefulness of the Products;

d.       Whether, by the misconduct set forth herein, Defendant violated consumer protection statutes and/or false advertising statutes and/or state deceptive business practices statutes;

e.       Whether, by the misconduct set forth herein, Defendant violated the common laws of negligent misrepresentation and unjust enrichment;

f.       Whether, by the misconduct set forth herein, Defendant breached its duty of good faith and fair dealing; and

g.       The nature and extent of damages and other remedies to which the conduct of Defendant entitles the class members.

87.     Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by the class members.  Similar or identical claims, marketing and logos, statutory, common law violations and deceptive business practices are involved.  Individual questions, if any, pale by comparison to the numerous common questions that dominate.

88.     The injuries sustained by the class members flow, in each instance, from a common nucleus of operative facts: Defendant's misconduct.  In each case Defendant designed, manufactured, supplied, and/or sold deceptive packaging, ads, and web pages for their Thunderbolt products.

89. The class members have been damaged by Defendant's misconduct as detailed *supra* including but not limited to the financial loss from the extra expense for a feature that Defendant touted as a benefit of their Product, which benefit did not in reality exist.

90. Plaintiff's claims are typical of the claims of the other proposed class members. Each member of the proposed Class purchased Defendant's Products to their detriment and was damaged thereby.

91. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is familiar with the basic facts that form the basis of the proposed class members' claims. Plaintiff's interests do not conflict with the interests of the other class members that he seeks to represent. Plaintiff has retained counsel competent and experienced in class action litigation and intends to prosecute this action vigorously. Plaintiff's counsel has successfully prosecuted complex class actions, including consumer protection class actions. Plaintiff and Plaintiff's counsel will fairly and adequately protect the interests of the class members.

92. The class action device is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and the proposed class members. The relief sought per individual member of the Class is small given the burden and expense of individual prosecution of the potentially extensive litigation necessitated by Defendant's conduct. Furthermore, it would be virtually impossible for the class members to seek redress on an individual basis. Even if the class members themselves could afford such individual litigation, the court system could not.

93. Individual litigation of the legal and actual issues raised by the conduct of Defendant would increase delay and expense to all parties and to the court system. The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale and comprehensive supervision by a single court. Given the similar

17

nature of the class members' claims and the absence of material differences in the state statutes and common laws upon which the class members' claims are based, a nationwide Class will be easily managed by the Court and the parties.

## FIRST CAUSE OF ACTION
### Implied Warranty of Merchantability and Fitness for Particular Purpose

94.     The Plaintiff hereby incorporates by reference each paragraph of this Complaint, as if fully set forth herein.

95.     Defendant warranted that the Thunderbolt Products were of a specific merchantable quality. The Defendant is a well-known merchant with respect to goods of that kind.

96.     Plaintiff and the class relied on Defendant's skill and ability to furnish suitable goods.

97.     The Thunderbolt Products did not conform to the promise or affirmations of fact made on the packages, ads or online.

98.     As the result of Defendant's conduct, Plaintiff and the class were harmed.

## SECOND CAUSE OF ACTION
### Breach of GBL 349 and 350 and the Various Analogous State Consumer and Advertising Laws

99.     The Plaintiff hereby incorporates by reference each paragraph of this Complaint, as if fully set forth herein.

100.     Defendant's sale of Thunderbolt Products to Plaintiff and the Class as described herein constitute the "conduct of any trade or commerce" within the meaning of NYS GBL 349 and 350.

101.     Defendant's advertisement of Thunderbolt Products to Plaintiff and the Class as described herein constitute the "false advertising in the conduct of any business, trade or commerce" within the meaning of NYS GBL 350

18

102. Defendant in the normal course of its business advertised and sold Thunderbolt Products with deceptive claims on its packaging. Defendant misrepresented the speed, ability and usefulness of the Thunderbolt Products.

103. The foregoing acts and conduct of Defendant are deceptive in that Defendant represented to the consumer class that its Thunderbolt Products could perform data transfer operations at speeds they physically could not.

104. By warranting Thunderbolt Products as they did, Defendant violated consumer protection statutes and/or false advertising statutes and/or state deceptive business practices statutes and by its deceptive actions, plaintiff and the class were harmed.

## THIRD CAUSE OF ACTION
### Common Law Fraud

105. Plaintiff repeats and incorporates the allegations above as if fully set forth herein.

106. Defendant actively concealed from and failed to disclose to Plaintiff and the Class the true capabilities of the Thunderbolt Products as described above.

107. Defendant knows the true character and quality of their Thunderbolt Products and their true specifications and capabilities, yet represented other capabilities for their product that they knew were impossible to attain.

108. Defendant knew the true specifications and capabilities of the Thunderbolt Products, but did not disclose the speed limitations of its hard drives in its sales, packaging, marketing and advertising, as alleged above, in order to drive sales to its new and more expensive product.

109. Plaintiff and the Class reasonably relied on the packaging, marketing, and advertising by Defendant of its Thunderbolt Products as having these false capabilities.

110. The facts concealed by Defendant from Plaintiff and the Class are material facts because any reasonable person would have considered those facts to be important in deciding

19

whether or not to spend additional monies to purchase the Thunderbolt Products.

111.    Defendant intentionally concealed and failed to disclose the true facts about the Thunderbolt Products for the purpose of inducing Plaintiff and the Class to purchase the Thunderbolt Products.

112.    Had Plaintiff and the Class known of the true abilities in the Products, they would not have purchased the Thunderbolt Products at a premium price.

113.    As the result of Defendant's conduct, Plaintiff and the class were harmed by paying more for Defendant's Thunderbolt Products than lower priced products of equal capabilities.

### JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all the claims asserted.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the proposed class members request that the Court enter an order or judgment against Defendant including the following:

A.    Certification of the action under the Federal Rules of Civil Procedure and appointment of Plaintiff as Class Representative and his counsel of record as Class Counsel;

B.    Actual damages, statutory damages, punitive or treble damages, and such other relief as provided by the statutes cited herein;

C.    Equitable relief in the form of restitution and/or disgorgement of all unlawful or illegal profits received by Defendant as a result of the unfair, unlawful, and/or deceptive conduct alleged herein;

D.    The costs of bringing this suit, including reasonable attorneys' fees; and

E.      All other relief to which Plaintiff and members of the proposed Class may be entitled

at law or in equity.

Dated: November 14, 2013
       Manhasset, New York

**LAW OFFICES OF PAUL C. WHALEN, P.C.**

By: _____
Paul C. Whalen (PW 1300)
768 Plandome Road
Manhasset, NY 11030
Telephone: (516) 627-5610

*Attorney for Plaintiff*